WIGGINTON, Judge.
Claimant brings this appeal from the order of the judge of compensation claims *1347 awarding temporary total disability benefits from May 1, 1990, through September 18, 1990, but denying all claims for medical benefits. For the following reasons, we affirm in part and reverse 'in part.
Claimant is a 46-year-old female who was employed by AT & T Communications when she sustained her industrial injury. At that time, she was participating in AT & T’s executive loan program with the United Way and was responsible for conducting presentations at various businesses. In doing so, she utilized a projector, which she carried herself.
In December 1988, claimant experienced pain in her left shoulder after reaching to open a car lock while in the process of going to another meeting. She subsequently related the pain in her left shoulder to carrying the projector. Consequently, it was arranged that claimant would no longer carry the projector or participate in the executive loan program; instead, she worked in a staff capacity as a quality consultant from January 1989 through March 1989. This position did not require any manual labor and was within claimant’s physical capabilities.
Nevertheless, claimant continued to experience difficulties with her left shoulder. She was examined in February 1989 by the company physician who thereafter referred her to Dr. Shea, an orthopedic surgeon.
Claimant was initially treated by Dr. Shea on March 1, 1989, for the pain in her left shoulder; no complaint of any pain was registered in regards to her right arm or shoulder. Dr. Shea determined that claimant suffered from adhesive capsulitis of the left shoulder. This diagnosis was based largely upon the history provided by her and her limited range of motion. Dr. Shea later described the condition as being caused by prolonged immobilization due to pain, resulting in a stiff shoulder.
Since physical therapy did not appear to improve claimant’s range of motion, Dr. Shea performed a manipulation of her left shoulder on April 25, 1989, in order to break the adhesions. Claimant was discharged on April 28 and prescribed intensive physical therapy. She progressed in therapy with noted marked improvement of the left shoulder. In Dr. Shea’s opinion, claimant reached maximum medical improvement with regard to her left shoulder on July 13, 1989, with a permanent impairment of two percent of the body as a whole, and restrictions against throwing activities and activities resulting in an extreme or repeated range of motion of the shoulder. As recommended, claimant returned to work at AT & T. She eventually moved into a managerial position and was under the direct supervision of Ms. Paula Beavers. This position did not require manual labor and claimant was physically capable of performing the job. Ms. Beavers indicated that she was pleased with claimant’s job performance and reflected this opinion in her performance appraisal.
However, on October 26, 1989, claimant was again seen by Dr. Shea for right shoulder pain. Claimant did not relate this condition to any particular incident; rather, she indicated her right shoulder began hurting her and feeling stiff during the preceding week. Dr. Shea examined claimant and determined she exhibited early signs of adhesive capsulitis of the right shoulder. However, he opined that he did not believe claimant’s right shoulder condition was related to the industrial accident to which claimant had attributed her left shoulder injury. Furthermore, Dr. Shea specifically noted that claimant had no history of an injury to her right shoulder. Dr. Shea treated claimant’s right shoulder with physical therapy.
Claimant eventually elected to accept early retirement in January 1990, an option offered by AT & T to all eligible employees. However, in the meantime, she continued to experience problems with both of her shoulders and eventually desired alternative orthopedic care. In turn, AT & T provided such care through Dr. White, an orthopedic surgeon, who initially treated claimant on December 21,1989. He provid *1348 ed conservative treatment and prescribed therapy. Dr. White believed that claimant suffered from subacromial bursitis of both shoulders, but could not determine the exact cause of this condition. Instead, he deferred his opinion regarding the etiology of claimant’s shoulder conditions to Dr. Shea. A second opinion rendered from Dr. Csencsitz in January 1990 resulted in that doctor’s concurring in the opinions of Doctors White and Shea. Surgery was not indicated at that time.
Nonetheless, on February 14, 1990, Dr. White performed arthroscopic surgery on claimant’s right shoulder. This was followed by arthroscopic surgery on her left shoulder on May 1. Dr. White also prescribed a TENS unit for claimant for relief of pain. He believed claimant reached MMI for both shoulders on September 19, 1990, with a permanent impairment to both. In addition, he placed permanent restrictions on claimant.
Thereafter, mid-September 1990, claimant began to experience heart palpitations. She indicated these problems developed on a Sunday night and contacted Dr. White the following Monday morning, who, in turn, advised her to reduce her intake of Flexeril. Claimant continued, however, to experience heart problems and contacted her pharmacy the following day for medication. On Wednesday, she called Dr. White who reminded her that he was an orthopedic surgeon and suggested she see her regular doctor. Instead, claimant contacted her attorney and informed him she intended to go to the emergency room. At no point did claimant attempt to contact the E/C; rather, on September 14, 1990, claimant received treatment from Dr. Leiva, an internist, who admitted claimant to Sand Lake Hospital for testing.
In addition, upon admission to the hospital and due to her deep state of depression, claimant received psychiatric care by Dr. Saavedra. Dr. Saavedra made no attempt to obtain prior authorization and admitted that claimant did not present an emergency situation at the time of her initial evaluation. However, Dr. Saavedra continued to provide psychiatric care following claimant’s discharge from the hospital.
Due to continued pain, claimant sought unauthorized treatment at the Cleveland Clinic in Fort Lauderdale in January 1991. She was also referred by Dr. Leiva to Dr. Freeman, a rheumatologist, who initially treated claimant on February 27, 1991. Again, no prior authorization was sought for this treatment. Dr. Freeman deferred her opinion regarding the causation of the adhesive capsulitis to Dr. Shea, but ultimately diagnosed claimant’s condition as fibromyalgia — a generalized pain syndrome. Dr. Freeman opined that based on the temporal sequence of the pain evolution as described to her by claimant, she would relate the fibromyalgia to claimant’s initial accident, although she could not give a definite opinion as to what degree either shoulder presently contributed to the fibro-myalgia. She did opine that claimant was capable of performing some work, but cautioned that due to her pain and emotional concerns, she doubted that claimant would be able to concentrate to any appropriate degree.
In addition to the above-referenced treatment, claimant was also seen on May 24, 1991, by Dr. Erlich, a psychiatrist, for an independent medical evaluation. He opined claimant had a transient depressive disorder, but was unable to state within a reasonable degree of medical probability the cause of this disorder, other than to suggest simply that claimant may have possessed a tendency toward depression or that it could have been caused by stress. In the converse, Dr. Erlich was unable to state within a reasonable degree of medical probability whether claimant’s disorder was the direct and immediate result of the industrial accident.
In his order, the judge of compensation claims awarded temporary total disability benefits from May 1, 1990, through September 18, 1990, reflecting the period of time claimant remained in an “off-work” status due to her left shoulder injury. *1349 However, he denied her claim for medical treatment and reimbursement of medical bills relating to claimant’s right shoulder condition and the treatment received by Dr. Leiva, Dr. Freeman, and Dr. Saavedra, as well as expenses incurred at Sand Lake Hospital and the Cleveland Clinic. The JCC also found that claimant had voluntarily limited her income by accepting early retirement, finding she had unreasonably refused suitable employment made available to her by AT & T since January 1, 1990. Finally, in denying claimant’s claim for psychiatric benefits, the JCC accepted the opinion of Dr. Erlich over that of Dr. Saavedra, concluding Dr. Erlich’s opinion coincided with logic and reason.
Turning to the first issue raised on appeal, claimant argues that the JCC erred in ruling the expenses incurred by her in obtaining medical care and treatment from Doctors Leiva, Saavedra, and Freeman, and from the Cleveland Clinic and Sand Lake Hospital, were not the responsibility of the employer and carrier. In so arguing, she submits the JCC employed an insufficient and improper standard in denying this medical care solely on the basis of his conclusion that the care was unauthorized and that no emergency situation existed. We agree.
First, in regards to the care rendered by Dr. Leiva at Sand Lake Hospital, the only factual basis in the record for any determination that no emergency existed was the fact that it took claimant several days to achieve that care. In contrast, Dr. Leiva unequivocally testified that the care he rendered initially at Sand Lake Hospital was the result of an emergency situation due to her heart palpitations. Thus, the JCC erred in denying the claim for reimbursement for at least that portion of Dr. Leiva’s care that was rendered initially as a result of the heart palpitations on an emergency basis.
We also agree with claimant that the JCC applied an improper standard in denying, in toto, claimant’s claim for medical care strictly on the basis that it was unauthorized. It has been held that a claimant’s receipt of unauthorized medical care does not alone act to deny that claimant the right to be reimbursed his or her expenditure for such care in all circumstances. Thus, in cases where medical care was requested or where the employer/carrier had knowledge of the need for such care, the claimant is entitled to seek medical treatment and be reimbursed therefor upon a judge of compensation claims’ finding that such care was either rendered as a result of an emergency or was otherwise medically necessary and appropriate. See McGehee v. Broward Community College, 559 So.2d 368 (Fla. 1st DCA1990); Gephart v. Silver Springs Shores Golf & Country Club, Inc., 545 So.2d 330 (Fla. 1st DCA1989).
Turning to the instant facts, with the exception of that portion of the care initially rendered by Dr. Leiva at Sand Lake Hospital on an emergency basis, we would agree with the E/C that the remaining care thereafter rendered to claimant by Dr. Leiva and the other physicians was not rendered on an emergency basis and was clearly unauthorized. However, based on the above-cited case law, it was nonetheless incumbent upon the JCC to review the record and determine whether this care was requested of the carrier by the claimant and was medically reasonable and necessary. In that regard, the record establishes that beginning on October 23, 1990, and extending through April 10, 1991, claimant’s attorney sent numerous letters to the E/C requesting a variety of medical care and treatment from not only the physicians herein involved, but from other physicians as well. Thus, the JCC erred in denying the claim for medical treatment, and the cause must be remanded to allow him to readdress the issue of the requested medical care by applying the appropriate standard in evaluating the reasonableness and necessity of the treatment rendered.
Under Point II, claimant maintains that the JCC erred in ruling that her right *1350 shoulder condition is unrelated to her employment. As a preliminary observation, we note there is competent and substantial evidence to support the JCC’s finding that the right shoulder condition itself is not causally connected to the industrial accident. However, the inquiry does not cease once it is shown that the claimant has suffered a subsequent noncompensable injury, if the claimant is still suffering the effects of the first, compensable accident. See Curtis v. Bordo Citrus Products, 566 So.2d 328 (Fla. 1st DCA1990); Parish v. Baptist Hospital, 512 So.2d 1031 (Fla. 1st DCA1987). In this case, claimant has undeniably continued to suffer the effects of the compensable left shoulder adhesive capsulitis. Moreover, claimant’s pain syndrome due to both shoulder injuries has become so evasive and generalized that, as Dr. Freeman opined, it would be difficult to determine to what degree either contributed to the causation of her existing fibro-myalgia. Thus, an evidentiary issue was presented, and it was incumbent upon the JCC to analyze the case from the point of view as to what portion of claimant’s present disability is caused by the compensable accident, even where the noncompensable accident may be an independent and sufficient producing cause of claimant’s disability. Curtis. Thus, to the extent the JCC denied benefits solely on the basis that her right shoulder injury was noncompensable, we reverse and remand for further consideration.
Turning to Point III, the claimant argues that the JCC erred in ruling her psychiatric condition not causally related to her left shoulder injury. We agree. The general rule is that despite the JCC’s prerogative to accept the medical opinion of one physician over that Of another, the JCC must nonetheless state the reason for doing so when the reason is not apparent from the record, or it appears the JCC has overlooked or ignored the evidence. Yeargin Construction Co. v. Hutchinson, 547 So.2d 1269 (Fla. 1st DCA1989). In the instant case, the reason for the JCC’s finding that Dr. Erlich’s opinion was more logical and reasonable than that of Dr. Saavedra is unclear, and, in light of the strength of Dr. Saavedra’s depositional testimony, we feel the JCC may have overlooked or misinterpreted the evidence.
The record reflects that Dr. Erlich examined claimant on a single occasion to render an independent medical examination scheduled by the E/C. In contrast, Dr. Saavedra had treated claimant on numerous occasions beginning with claimant’s admission to Sand Lake Hospital at the time she was suffering heart palpitations and severe depression. Furthermore, at the time Dr. Erlich examined claimant, she had been on Prozac and was feeling much better, a point Dr. Erlich, himself, noted. Indeed, one could argue that Dr. Erlich’s testimony is not in conflict with that of Dr. Saavedra. In his deposition, Dr. Erlich could not say within a reasonable degree of medical probability whether claimant’s depressive disorder was or was not a direct and immediate result of the accident and its sequelae. On the other hand, Dr. Saavedra took a history from claimant relating her severe pain to her left shoulder injury, and it was her opinion that claimant’s psychiatric condition began with the pain from that injury. Thus, to the extent the JCC’s order denying psychiatric benefits is dependent on his acceptance of Dr. Erlich’s opinion over that of Dr. Saavedra, the cause should be reversed and remanded for further proceedings for the JCC to reconsider the testimony and set forth sufficient reasons for his accepting one medical opinion over that of another on this point.
Finally, under Point IV, the claimant argues that the JCC erred in ruling she was not entitled to further compensation benefits subsequent to September 19, 1990, on the basis that she had voluntarily limited her income by accepting early retirement. We agree and reverse on this point as well. It is clear from this court’s earlier decision in Southern Bell Telephone & Telegraph Company v. Seneca, 512 So.2d 1005 (Fla. 1st DCA1987), that the mere fact *1351 of voluntary retirement does not end the inquiry. In Seneca, this court held that a claimant’s “voluntary retirement cannot be considered a voluntary limitation of his income in perpetuity_” Id. at 1006. Thus, where there is an adequate work search or other evidence by which a claimant could carry his or her burden, denial of benefits solely on the basis of voluntary retirement is in error.
In the instant case, while claimant may have been initially capable of carrying on her job responsibilities at the time she chose to voluntarily retire, it is clear from the record that following her subsequent shoulder surgeries her condition deteriorated. The issue is further complicated by the claimant’s assertion that the E/C did not at any time inform her of her responsibility to conduct a work search. Recently, in Roll v. Sebastian Inlet, 609 So.2d 674 (Fla. 1st DCA 1992), this court held that the E/C’s responsibility to inform a claimant of the obligation to perform a work search is not discharged by that claimant’s voluntary retirement, when the evidence shows the employer was fully aware that the claimant was limited to light-duty employment as a result of the industrial injury. Thus, in the instant case, to the extent that the JCC denied all benefits strictly on the basis of claimant’s voluntary retirement, reversal and remand is once again required for the JCC to reconsider the evidence and apply the appropriate analysis.
AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.
SMITH and WOLF, JJ., concur.